# The Mechanical License

For an artist to record and distribute a song that the original songwriter has already recorded and distributed, often called a "cover", first the artist should obtain permission or a mechanical license. Similarly, a digital music service that wants to provide downloads of the song needs either the permission or the license. But the mechanical license is rarely used perhaps because of the cumbersome procedures it sets up and the Harry Fox Agency (HFA) has emerged as a collective agent that offers licenses which operate in the shadow of the mechanical license. While licensing for covers through the HFA may have worked well in the analog world, digital music services and record labels agree that neither the license nor the HFA are suited for digital delivery of music. While the license sets up extremely cumbersome procedures that digital services find almost impossible to follow, the HFA is unable to license rights on a scale that digital music services need in order to be viable. Hence, these services have led the charge – along with artists, fans, labels and consumer advocacy groups– in calling for reform to streamline the mechanical licensing process.

# Background

The "mechanical license" allows anyone to make a cover of a copyrighted composition, once the songwriter or composer has himself recorded the song and distributed it. The person making the cover must pay the copyright owner a set fee for each copy of the cover "made and distributed". Additionally, he must serve the copyright owner with a notice of intent to use the work and provide monthly payments and statements of account.

The mechanical license has been around since the Copyright Act of 1909. However, the provisions contained in Section 115 are rarely used, perhaps because the notice and accounting requirements are cumbersome. Instead, most record labels or artists who want to create covers negotiate a license with the Harry Fox Agency, a collective of composers and publishers. While Section 115 does not prohibit voluntary negotiations between parties, it does act as a ceiling on the rate that can be charged for a license.

By amendment in 1995, Congress extended the mechanical license provisions of Section 115 to digital deliveries of music—referred to as Digital Phonorecord Deliveries or DPDs. This means that whenever a service such as iTunes allows a customer to download a song, the composer of that song must be paid the either the mechanical license or a voluntarily negotiated royalty.

# Specific Problems with the Section 115 Licensing Process

## Rate Structure

One of the most pressing questions regards the rate structure: should it be based on each record sold or on some other metric such as a percentage of the music provider's revenue? Many record labels (see RIAA "Written Direct Testimony") and digital music providers (see "Introductory Memorandum") such as Napster, Apple and Yahoo! claim that rates should be based on a percentage of revenue—especially in a world where single track sales are outpacing the sales of full-length albums. Jonathan Potter, president of Digital Media Association (DiMA), a group that represents the interests of companies providing digital content, explains that the current penny rate is overly restrictive and does not account for changes in consumer offerings and prices. For instance, publishers see Dual Disc CDs (CD albums that contain CD audio on one side of the disc and DVD/multimedia content on the other side) as two separate copies of

the album and thus, require two payments.

## The Notice Requirement

Another complaint that digital media companies have regards the notice requirements of Section 115. Under these requirements, distributors have to physically mail notices of intent to each copyright owner. This requirement is outdated, the media companies argue, because nowadays, a digital storefront must offer at least one million songs in order to be competitive. Even though many songs may have the same copyright owner, digital music companies still have to physically mail an unreasonably high number of notices – a requirement that media companies claim is both wasteful and cumbersome.

## Scope of the License

The third major problem with the Section 115 license relates to the scope of the license. Because of the nature of digital technology, a number of copies—known as incidental reproductions—are made in the course of the transmission of a song. For example, let's say that you purchase a track from an online music service like iTunes. In order for iTunes to transmit that file to you, it might need to make incidental copies of that file—for purposes of caching or buffering. On the user side, incidental copies might also be made—for example, a file that is downloaded to your desktop and then "imported" (i.e. copied) into your music library, which lives elsewhere on your hard drive. While these incidental copies do not result in the customer receiving an additional, permanent copy of the music in question, some copyright owners claim that these files are still implicated under Section 115 and should be licensed just like any other piece of music.

The National Music Publishers Association claims that incidental reproductions made in the course of both on-demand streams (where the user is able to select songs and create playlists, unlike in traditional radio) and limited downloads (files that download to your hard drive that become unusable after a certain number of plays or after a certain amount of time has elapsed) should be licensed.

Music publishers claim that on-demand streams allow customers to choose the music they want, when they want it and additionally, allow those customers to record that music. For these reasons, they argue that on-demand streams constitute a distribution of music on the same order as a permanent download and thus, should be licensed like any other piece of music. In fact, the National Music Publishers Association, the Harry Fox Agency and the Recording Industry Association of America have already entered into an agreement to this effect.

But that's not all. Performance rights societies i.e. ASCAP, BMI claim that on-demand streams also constitute a performance of the work in question and for this reason, charge a higher performance royalty for such streams. As a result, digital media companies end up paying two royalties for the same song—one to the performance rights societies and one to the National Music Publishers Association or the Harry Fox Agency. DiMA companies concede that while on-demand streams may warrant higher performance royalties, they should be exempt from the Section 115 license. Furthermore, they feel that incidental reproductions should be completely exempt from any license.

Ambiguity in Section 115 has certainly created a lot of room for confusion on all sides of the debate. Section 115 defines the standard unit of measurement for digital music sales—Digital Phonorecord Deliveries or DPDs—as a "specifically identifiable reproduction" of a piece of music, regardless of whether or not that reproduction also constitutes a public performance. This creates the possibility of interpreting a piece of music as both a DPD and a performance!

# Why Not go to the Harry Fox Agency Instead of Using Section 115?

Despite all this talk of Section 115, as we mentioned earlier, the Section 115 license is actually seldom used—most record labels simply go to the Harry Fox Agency for a mechanical license when releasing a physical product that requires licensing (for example, a cover album). This being the case, why can't a digital media company also go to Harry Fox and obtain a mechanical license, thereby sidestepping the hassles involved in the Section 115 license? Well, as DiMA would say, the Harry Fox Agency does not represent all music copyright owners and DiMA companies often need to access works that fall outside of Harry Fox's domain. These companies claim that that's not the only problem with The Harry Fox Agency: the Agency refuses to disclose all of the publishers that it represents and publishers are free to withdraw their works from the Harry Fox catalog at any time. According to DiMA president Jonathan Potter, between 40 and 60 percent of all license requests are denied by The Harry Fox Agency because the songs are not in its repertory—or because the Agency isn't sure if it holds the rights to the song.

# Reform Proposals

We have outlined the problems with the current licensing regime under Section 115 of the Copyright Act —but what are the potential solutions? Several reforms have been proposed over the years, ranging from a complete elimination of the license in favor of marketplace-driven negotiations to smaller changes that would only require clarification of specific ambiguities in the scope of the license. Here are a few of the more notable proposals.

## Elimination of the License

In her testimony before the House Subcommittee on Courts, Internet and Intellectual Property, Marybeth Peters, the U.S. Register of Copyrights, proposed a complete elimination of the Section 115 license. The Register argued that the license limited the bargaining power of authors. She explained that the performance rights societies—ASCAP, BMI and SESAC—have functioned efficiently without a compulsory license and the same model should be adopted for licensing mechanical rights. Expanding on this testimony a year later, the Register proposed the introduction of the 21st Century Music Reform Act. Under this Act, Music Rights Organizations (MROs) would be created with the right to license performance, reproduction and distribution rights. Thus, the functions performed by ASCAP, BMI, SESAC and The Harry Fox Agency would all be subsumed by one entity. This would eliminate the need to license different rights from different entities in order to use one piece of music.

## Unilicense

This proposal was put forth by the Songwriters Guild of America in 2005. The Guild proposed a blanket license for licensing reproduction, distribution and performance rights. The royalty would be 16 and 2/3 percent of the gross Internet subscription revenues with a minimum dollar fee as the floor. Songwriters and publishers would each share 50 percent of the royalties. This proposal, like the 21st Century Music Reform Act, would provide for one-stop shopping for all rights needed to transmit a piece of music.

## Shifting the burden to record companies

Another proposal put forth by the Copyright Office was to shift the burden of obtaining a license to transmit a DPD to the record company. Register Peters, in her testimony before the House Subcommittee on Courts, the Internet and Intellectual Property, explained that current law allows record companies to seek permission from recording artists, in their contracts, to make music available through DPDs. This provision could be clarified and expanded upon to funnel payments for DPDs through record companies.

# Legislative Efforts to Reform Section 115

Cited in Roose LLC v Rounder Records Corp (09cv318) Archived on 2/1/11

This document is protected by copyright. Further reproduction is prohibited without permission.

# The Section 115 Reform Act (SIRA)

The Section 115 Reform Act or SIRA was introduced in the House Subcommittee on Courts, the Internet, and Intellectual Property on June 8, 2006. The stated purpose of the bill was "to provide for licensing of digital delivery of musical works". The bill would have provided a blanket license to digital music providers that would cover all digital deliveries of music including full downloads, limited downloads and on-demand streams, in addition to all incidental copies made in the course of licensed downloads. The act would have also established agents, referred to as the "general designated agent" and "additional designated agents" to issue licenses and collect royalties on behalf of copyright owners. The Copyright Royalty Judges would set the royalty rates and the rights of parties to enter into voluntary licensing agreements would also have been preserved.

# Problems with SIRA

While these provisions were positive and would have improved the licensing process for digital music delivery, SIRA contained provisions that would have perpetuated unfair record label contract clauses, and unfairly curtailed the rights of the consumer and artists.

## Diverting Licensing Fees From Artists to Labels

For example, provisions of the SIRA would have allowed recording artists to direct designated agents to divert their license fees to record labels, in order to recoup advances that the labels had provided them. While technically, the artist would have had the choice whether or not to divert such payments, the difference in bargaining power between the artists and labels cast doubts on the fairness of the arrangement. Besides, there was arguably no need for copyright legislation to contain provisions that aided record labels in recouping their costs.

In the event that an artist could not be located ("orphan works" ring a bell?), the record label could itself direct the designated agent to make payments directly to the label. As Public Knowledge President Gigi Sohn has pointed out, these provisions would have pre-empted or superseded any state laws that address unclaimed property. Why is this important? It appears that these provisions may have been aimed at New York settlements where record labels and publishers were required to pay back $50 million in royalties that should have been paid to artists. New York state law states that if an owner entitled to funds cannot be found, the property escheats to the government. The government then holds this money until the artist claims it. Despite such provisions, SIRA would have prevented some artists from receiving their publishing royalties.

## Unfair to Consumers

SIRA would also have curtailed consumer home recording rights (often referred to as "fair use" right). SIRA would have required a license, albeit a royalty free license, for all incidental reproductions in the course of non-interactive streaming, such as an Internet radio webcast, only if the service in question did not "authorize, enable, cause, or induce" the recording of streams. Thus, SIRA would have prevented consumers from making noncommercial personal recordings and backups—for example, a homemade CD of tracks that were originally purchased online. Additionally, because a license could be denied to a transmitter that allowed the fair use kind of recording, SIRA would have restricted the kinds of music listening devices on which music could be recorded. Finally, the provision, if enacted, would have interfered with outcome of a lawsuit brought against XM Satellite Radio, over the previously mentioned inno player.

SIRA had other problems as well. While it covered all incidental reproductions in the course of a DPD within the scope of a license, it did not exempt incidental reproductions from a license requirement. Requiring licenses for incidental copies, which even the Register of Copyrights acknowledges have no independent economic value, would have unnecessarily and unfairly increased the cost of using music

Cited in Napster LLC v Rounder Records Corp
09 Civ 0318 on 2/1/11
Archived document is protected by copyright.
Further reproduction is prohibited without permission.

services for consumers. Additionally, while SIRA treated interactive streams as DPDs it did not clarify that such streams were not performances. As a result, the bill would have done nothing to prevent copyright owners from demanding payment for both the mechanical and performance rights for the same stream.